Slip Op. 16-3

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CC METALS AND ALLOYS, LLC, AND GLOBE SPECIALTY METALS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 14-00202 |

**OPINION and ORDER**

[Final determination of sales not at less than fair value sustained in part and remanded in part.]

Dated: January 12, 2016

<u>William D. Kramer</u> and <u>Martin Schaefermeier</u>, DLA Piper LLP (US), of Washington, DC for Plaintiff CC Metals and Alloys, LLC and Globe Specialty Metals, Inc.

<u>Peter A. Gwynne</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With him on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Devin S. Sikes</u>, Senior Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

<u>Sydney H. Mintzer</u> and <u>Jing Zhang</u>, Mayer Brown LLP, of Washington, DC for Defendant-Intervenors Kuznetsk Ferroalloys OAO, Chelyabinsk Electro-Metallurgical Plant OAO and RFA International LP, Calgary (Kanada) Schaffausen.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final negative determination in the less than fair value investigation of ferrosilicon from the Russian Federation. <u>See</u> <u>Ferrosilicon from the Russian Federation</u>,

79 Fed. Reg. 44,393 (Dep't of Commerce July 31, 2014) (final LTFV determ.)

("Final Determination"); see also Issues and Decision Memorandum for the Final

Determination of the Antidumping Duty Investigation of Ferrosilicon from the Russian

Federation, A-821-820 (Dep't of Commerce July 24, 2014), available at

http://enforcement.trade.gov/frn/summary/russia/2014-18059-1.pdf (last visited this date)

("Decision Memorandum").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record

of Plaintiffs CC Metals and Alloys, LLC, and Globe Specialty Metals, Inc. ("Plaintiffs").

Pls.' Br. in Supp. of Mot. for J. upon the Agency R. (Jan. 22, 2015), ECF No. 23 ("Pls.'

Br."); see also Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. (Apr. 14, 2015), ECF

No. 38 ("Def.'s Resp."); Br. of Def.-Intervenors in Opp. to Pls.' Mot. for J. upon the Agency

R. (May 7, 2015) ("Def-Int.'s Resp."); Pls.' Reply Br. (May 29, 2015), ECF No. 49 ("Pls.'

Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c)

(2012).

Plaintiffs challenge Commerce's date of sale selection and model matching

analysis, as well as Commerce's treatment of certain revenue and expenses. For the

reasons that follow, the court sustains Commerce's determination in part and remands to

Commerce the warehousing and imputed credit expense issues for further consideration.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of

Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."). And when reviewing Commerce's interpretation of its regulations, the court must give substantial deference to Commerce's interpretation, Torrington Co. v. United States, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998), according it "'controlling weight unless it is plainly erroneous or inconsistent with the regulation,'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (citations omitted). See also Am. Signature, Inc. v. United States, 598 F.3d 816, 827 (Fed. Cir. 2010) (citing Reizenstein v. Shinseki, 583 F.3d 1331, 1335 (Fed. Cir. 2009)) (explaining standard of review for agency interpretations of its own regulations).

## II. Discussion

### A. Date of Sale

In general "an antidumping analysis involves a comparison of export price or constructed export price in the United States with normal value in the foreign market." 19 C.F.R. § 351.401(a) (2015); see also 19 U.S.C. §§ 1677a, 1677b. The date of sale for a respondent's home market sales is part of the normal value calculation. See 19 C.F.R. § 351.401(a), (i).

During the proceeding, Commerce, consistent with its regulatory presumption, selected invoice date as the date of sale for RFA International LP's ("RFAI") home market sales, including RFAI's "storage sales." These "storage sales" are "bill-and-hold" type transactions where RFAI's affiliated producer Chelyabinsk Electrometallurgical Integrated

Plant Joint Stock Company ("CHEMK") stores customers' ferrosilicon after the invoice is issued for delivery at a later date. Plaintiffs argue that Commerce should not have selected the invoice date as the date of sale for these storage sales because of differences between the ferrosilicon described in the invoices and the ferrosilicon CHEMK delivered.

Commerce "normally" uses invoice date as the date of sale. 19 C.F.R. § 351.401(i). Commerce "may," however, "use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." Id. An interested party proposing something other than invoice date must demonstrate that the material terms of sale were "firmly" and "finally" established on its proposed date of sale. Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997) ("Preamble"); see generally Yieh Phui Enter. Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1319, 1322-24 (2011) (describing in detail Commerce's date of sale regulation).

Plaintiffs' argument attacks the "virtual" nature of CHEMK's storage sales. See Pls.' Br. at 6-12. CHEMK does not set aside particular ferrosilicon from its ongoing production when it completes a storage sale. Instead, CHEMK virtually "reserves" orders so that ferrosilicon meeting the customer's specifications is available when the customer requests delivery. Some physical differences between the "as invoiced" and "as delivered" product can and do emerge because CHEMK and its customers specify only certain terms when the sale is invoiced. These are typically "base weight" (the weight of silicon

contained within the ferrosilicon), grade (based on silicon content by percent), price, and size. Home Market Verification Report, 8-9 (Dep't of Commerce May 22, 2014), CD 151 ("Verification Report").[2] Plaintiffs note that the CONNUMs for a significant number of the "as delivered" storage sales differ from their "as invoiced" counterparts. Pls.' Br. at 8-9. Plaintiffs also argue that using invoice date artificially reduces RFAI's normal value, thereby lowering its overall margin.

Problematically, Plaintiffs do not appear to understand the applicable standards governing Commerce's date of sale determinations. Plaintiffs never identify the date on which Plaintiffs believe the material terms of sale are firmly and finally established. See id. at 3-12. To prevail, Plaintiffs need to establish that Commerce erred by using invoice date because the administrative record supports one and only one other date of sale on which the material terms of sale are firmly and finally established. See Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1371-72, 127 F. Supp. 2d 207, 220 (2000) ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its [date of sale] as the only reasonable outcome."). Here, CHEMK's storage sales comprise numerous documents, addendums, and circumstances other than mere issuance of an invoice. Commerce's regulation defaults to the invoice date precisely because this sort of complexity is prevalent in most industries. Preamble, 62 Fed. Reg. at 27,348-49 ("[I]n most industries, the negotiation of a sale can be a complex process . . . . In fact, it is not uncommon for the buyer and seller

---

[2] "CD" refers to a confidential document contained in the administrative record.

themselves to disagree about the exact date on which the terms became final. However, for them, this theoretical date usually has little, if any, relevance. From their perspective, the relevant issue is that the terms be fixed when the seller demands payment . . . ."). By failing to identify the date on which the material terms of sale are firmly and finally established, Plaintiffs leave the court no option but to sustain Commerce's choice of its regulatory presumptive invoice date as the date of sale.

With that said, the court does address some of Plaintiffs' date of sale arguments that are relied upon by Plaintiffs in their subsequent model match issue. Chief among them is Plaintiffs' argument about which terms are material. During the investigation Commerce concluded (and Plaintiffs do not dispute) that the material terms of sale were grade, price, base weight, and size. Decision Memorandum at 14 (listing grade, price, and base weight as material terms); Verification Report at 8 (discussing size). Each of these terms "are finalized" on CHEMK's invoices. Id.; see also Def.'s Br. at 11-13 (summarizing specific examples on the record). With one exception discussed below (size), these material terms did not change after invoicing. CHEMK's storage agreements explicitly stipulate "that the customer agrees to receive merchandise that was commingled whilst in storage, as long as the merchandise it receives is the same grade, size, and base quantity as invoiced." Verification Report at 8-9. CHEMK's customers paid for and subsequently accepted later delivered merchandise despite some variances in physical characteristics, but price, grade, and base weight remained the same, as did size, except in a few instances (discussed below). Decision Memorandum at 14-15. The reasonable conclusion, which Commerce reached, is that characteristics other than price, grade, size,

and base weight are <u>not</u> material terms. <u>Decision Memorandum</u> at 17-22; Final Analysis

Memorandum, 2-4 (Dep't of Commerce July 25, 2014), CD 162 ("<u>Final Analysis</u>

<u>Memorandum</u>").

       Plaintiffs argue that "chemical composition" is also a material term. Plaintiffs

reference one confidential sale outside the period of review in which a customer made a

request regarding chemical composition. Plaintiffs also note that CHEMK issues

certificates detailing chemical composition before delivery. Pls.' Br. at 10-12. There were

also other "rare[]" instances where customers specified maximum tolerances for elements

other than silicon. <u>Verification Report</u> at 9. Plaintiffs also argue that the number of

changes in the "product characteristics" after the invoice date demonstrate that the terms

of sale became finalized on some other date. Pls.' Br. at 8, 15, 17-20. Despite changes

in chemical composition, however, <u>all</u> of CHEMK's customers "received the identical

commercial grade of merchandise that was invoiced and eventually delivered without

incident." <u>Id.</u> at 14-15. So as Commerce noted, whatever changes to "chemical

composition" occurred, they "were not commercially relevant because record evidence

shows that the customers paid for the merchandise and did not reject or return the

merchandise." <u>Id.</u> at 14-15. This is an important, and ultimately decisive point.

       CHEMK did have a number of storage sales in which the size of ferrosilicon

changed between time of invoice and delivery. These sales represented a relatively small

portion of CHEMK's storage sales, <u>Final Analysis Memorandum</u> at 2-4, and without a

more definitive quantification from Plaintiffs, the court, like Commerce, cannot identify

how Plaintiffs' argument about the changes in size have any noticeable impact on the

margin calculation. Decision Memorandum at 22 ("Petitioners have not provided any alternative quantitative calculations showing exactly how using the 'as delivered' subset of sales, accounting for 18 percent of those home market sales, in the margin calculation program would have resulted in an affirmative determination."). To reiterate again, the court sustains Commerce's reasonable selection, in accordance with its regulatory presumption, of the invoice date as the date of sale.

### B. Model Matching

Plaintiffs' goal in challenging Commerce's date of sale selection is to increase (or at least alter) the universe of home market sales used to calculate RFAI's margin. Pls.' Br. at 3, 9. To that same end, Plaintiffs challenge Commerce's model-matching analysis. Specifically, Plaintiffs argue that Commerce's use of the "as invoiced" product characteristics of CHEMK's home market storage sales instead of the "as delivered" product characteristics deviates from past practice and is unreasonable.

Commerce determines dumping margins by comparing export price or constructed export price to normal value. Commerce sets normal value at "the price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i). "[F]oreign like product" is either identical merchandise, similar merchandise, or reasonable comparable merchandise. Id. § 1677(16); see Samsung Elecs. Co. v. United States, 39 CIT ___, ___, 72 F. Supp. 3d 1359, 1376 (2015) (summarizing the model matching provision). Where a given export sale lacks a corresponding identical home-market sale, Commerce looks to similar merchandise. Where an export sale lacks a corresponding identical or similar home market sale,

Commerce then turns to reasonably comparable merchandise. See id. The process by which Commerce identifies "foreign like product" in accordance with the statute is called "model-matching." Koyo Seiko v. United States, 551 F.3d 1286, 1289 (Fed. Cir. 2008).

"[A]n agency must either follow its own precedents or explain why it departs from them." See generally, 2 Richard J. Pierce, Administrative Law Treatise § 11.5, at 1037 (5th ed. 2010). Plaintiffs aver that Commerce departed from past practice by failing "to make product comparisons based on the physical characteristics of the merchandise actually delivered to the customer." Pls.' Br. at 13-14 (citing Stainless Steel Sheet and Strip in Coils from France, 64 Fed. Reg. 30,820, 30,830 (Dep't of Commerce June 8, 1999) (final LTFV determ.) ("SSSS from France")). The court does not agree. Commerce in SSSS from France noted that its practice is to use the product characteristics of delivered merchandise over invoiced merchandise "in cases where the grades reported in [specific CONNUM fields covering the grade of invoiced and delivered merchandise] differ." SSSS from France, 64 Fed. Reg. at 30,830 (emphasis added); see also Pls.' Br. at 14 (quoting the same language in SSSS from France). Commerce below reasonably distinguished SSSS from France, explaining that the grade did not change between invoicing and delivery for any of CHEMK's storage sales. Commerce explained further that, unlike SSSS from France, the differences in product characteristics here were not "commercially relevant" since they involved immaterial terms like chemical composition and total weight. Decision Memorandum at 22. Commerce's use of the invoiced product characteristics therefore did not run afoul of SSSS from France.

Plaintiffs' substantial evidence challenge largely tracks their arguments in opposition to Commerce's date of sale selection. See Pls.' Br. at 15-21. Plaintiffs highlight what they allege is a significant number of post-invoice changes in characteristics that they believe to be material, and argue that Commerce should have used the "as delivered" product characteristics for model match. See id. Unfortunately for Plaintiffs, for the same reasons described above, Commerce reasonably found that any differences between the "as delivered" and "as invoiced" merchandise are not material. See Decision Memorandum at 17-22. Plaintiffs have no good answer to the fact that CHEMK's Customers were invoiced, made payment, and then subsequently accepted the "as delivered" merchandise (with whatever changes in characteristics), leading Commerce to conclude that the "as delivered" merchandise was "commercially equivalent" to the "as invoiced" merchandise. Id. at 21-22.

Plaintiffs also failed to quantify the actual numerical effect of the small proportion of sales in which one material characteristic (size) did change post-invoice. The court notes that size, although a material term, ranked last in priority for the purposes of comparison to U.S. sales on Commerce's list of relevant physical characteristics. Decision Memorandum for Preliminary Determination of the Antidumping Duty Investigation of Ferrosilicon from the Russian Federation, A-821-820, at 12 (Dep't of Commerce Mar. 4, 2014), available at http://enforcement.trade.gov/ frn/summary/russia/2014-05251-1.pdf (last visited this date). The relative unimportance of size for model-matching purposes weakens Plaintiffs' position that using "as delivered"

sales has a material effect on RFAI's margin, which again, Plaintiffs failed to specifically quantify. See Decision Memorandum at 22.

The court therefore sustains Commerce's use of "as invoiced" sales characteristics in its model-matching analysis.

## C. Warehouse Expense and Revenue

As described above, RFAI's affiliated producer CHEMK warehouses some ferrosilicon at its production facility after completing a sale. Commerce found that CHEMK's warehousing produced both movement expenses deductible from normal value and, to a greater extent, revenues that could increase normal value. In accordance with its established practice, Commerce capped CHEMK's warehousing revenue at the level of warehousing expenses, resulting in no net effect on normal value. Decision Memorandum at 26; see also Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review of Circular Welded Carbon Steel Pipes and Tubes from Thailand, A-549-502, at 10-13 (Dep't of Commerce Oct. 23, 2013), available at http://enforcement.trade.gov/frn/summary/thailand/2014-25611-1.pdf (last visited this date) (describing and applying movement expense capping practice). Plaintiffs challenge Commerce's deduction of CHEMK's warehousing expense as inconsistent with law, thereby indirectly challenging Commerce's decision to cap CHEMK's warehousing revenue.

The statute directs Commerce to deduct from normal value "the amount, if any, . . . attributable to any costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser."

19 U.S.C. § 1677b(a)(6)(B)(ii). Commerce's regulations specify that movement expenses include any transportation and other associated expenses, including "warehousing expenses that are incurred <u>after</u> the merchandise leaves the original place of shipment." 19 C.F.R. § 351.401(e)(2) (emphasis added). The "original place of shipment" is "normally" the production facility. <u>Id.</u> § 351.401(e)(1). Plaintiffs argue that Commerce violated the regulation because CHEMK incurred warehousing expenses <u>before</u> the merchandise left the production facility.

Commerce's interpretation of its regulation is generally of controlling weight unless it is plainly erroneous or inconsistent with the regulation. <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997); <u>Am. Signature, Inc. v. United States</u>, 598 F.3d 816, 827 (Fed. Cir. 2010). Commerce acknowledges that CHEMK incurred its on-site, post-sale warehousing expenses before the goods left the production facility. <u>Decision Memorandum</u> at 26. The regulation specifies that Commerce will deduct warehousing expenses that are incurred "after" the merchandise leaves the production facility. 19 C.F.R. § 351.401(e). Commerce explained that CHEMK's on-site warehousing "qualif[ies] . . . as a movement-related expense, because the Preamble states that the Department will deduct all movement expenses (including all warehousing) that the producer incurred <u>after</u> the goods left the production facility." <u>Decision Memorandum</u> at 26 (referring to <u>Antidumping Duties;</u> <u>Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,345 (Dep't of Commerce May 19, 1997) (final rule) ("<u>Preamble</u>")) (emphasis added). Just like the regulation, the <u>Preamble</u> refers to warehousing expenses incurred "after" goods have left the production facility. <u>Id.</u> And

here the goods did not leave the production facility.   Commerce's application of its regulation therefore appears inconsistent with both the regulation and the Preamble.

Defendant's counsel, for its part, explains that the on-site warehousing described in the regulation and Preamble covers pre-sale warehousing, not CHEMK's post-sale warehousing at issue here. Def.'s Resp. at 30-31. Although, the regulation does not specifically address whether such post-sale warehousing may qualify as a deductible movement expense, the court cannot defer to the post hoc rationalizations of agency counsel. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962). Commerce itself did not discuss the "post-sale" vs. "pre-sale" distinction. The court therefore must remand this issue to Commerce for further consideration.

### D. Imputed Credit Expenses

Commerce adjusts normal value to account for differences in the circumstances of sale in the United States and foreign markets. 19 U.S.C. § 1677b(a)(6)(C)(iii). Commerce typically makes such an adjustment to account for differences in credit terms by "imput[ing] a U.S. credit expense and a foreign market credit expense on each sale." Imputed Credit Expenses and Interest Rates (Dep't of Commerce Feb. 23, 1998), available at http://enforcement.trade.gov/policy/bull98-2.htm (last visited this date). "The imputed credit expense represents the producer's opportunity cost of extending credit to its customers. By allowing the purchaser to make payment after the shipment date," on either home market sales or U.S. sales, "the producer forgoes the opportunity to earn interest on an immediate payment. Thus, the imputed credit expense reflects the loss attributable to the time value of money." Mitsubishi Heavy Indus., Ltd. v. United States,

23 CIT 326, 330, 54 F. Supp. 2d 1183, 1188 (1999), after remand, 24 CIT 275, 97 F.

Supp. 2d 1023 (2000), aff'd, 275 F.3d 1056 (Fed. Cir. 2001). Plaintiffs challenge the

interest rate Commerce selected to calculate RFAI's home market imputed credit

expenses.

Commerce's announced policy is to select "a short-term interest rate tied to the

currency in which the sales are denominated" that is "base[d] . . . on the respondent's

weighted-average short-term borrowing experience in the currency of the transaction."

Import Administration Policy Bulletin 98.2: Imputed Credit Expenses and Interest Rates

(Dep't of Commerce Feb. 23, 1998), available at http://enforcement.trade.gov/

policy/bull98-2.htm (last visited this date) ("Policy Bulletin 98.2"). "In cases where a

respondent has no short-term borrowings" in the same currency as its foreign

transactions, however, Commerce selects a proxy rate "on a case-by-case basis using

publicly available information, with a preference for published average short-term lending

rates." Id.

RFAI's affiliated producer CHEMK used "factoring" arrangements to finance

receivables on home market sales denominated in rubles during the period of review.

Factoring is a recognized form of financing that involves the sale of receivables at a

discounted rate. Issues and Decision Memorandum for the Final Results of the

Antidumping Administrative Review of Welded Carbon Steel Standard Pipe and Tube

Products from Turkey, A-489-501, at 14 (Dep't of Commerce Dec. 23, 2013), available at

http://enforcement.trade.gov/frn/summary/turkey/2013-31344-1.pdf ("Pipe and Tube from

Turkey Memorandum"). Despite these arrangements, however, RFAI reported in its

Section B questionnaire response that CHEMK had no-short term borrowings in rubles.

As a consequence, Commerce selected Russian short-term interest rates described in a

publicly available source as a proxy for RFAI's own short-term borrowing experience. See

Decision Memorandum at 27-29; see also Policy Bulletin 98.2.

    After the Preliminary Results but before verification, RFAI notified Commerce in a

"minor corrections" submission that it believed CHEMK's factoring arrangements could

be used to derive a rate that more accurately described its short-term borrowing

experience. Decision Memorandum at 28-30; see, e.g., Pipe and Tube from Turkey

Memorandum at 14 (using respondent's factoring arrangements to derive a rate "based

on the weighted-average interest rate paid by the [respondent] for short-term loans in the

currency of the sale" in accordance with Policy Bulletin 98.2). RFAI also provided

Commerce with a letter from a Russian bank describing the rates applicable to CHEMK's

factoring arrangements in support of its position. Commerce accepted RFAI's submission

as information that "corroborate[d], support[ed], or clarifie[d]" its initial Section B response

and verified that the supplied rates were accurate. Decision Memorandum at 30.

Commerce thereafter used an average of the rates applicable to the sales it verified as

the rate for RFAI's imputed credit expenses. Id. at 32.

    Plaintiffs first argue that Commerce should have rejected RFAI's minor corrections

submission because the interest rates it described constituted new information. The court

does not agree. Commerce's established practice is to accept new information when it

"corroborates, supports, or clarifies information already on the record." Ass'n of Am. Sch.

Paper Suppliers v. United States, 32 CIT 1196, 1217 (2008) (quoting CITIC Trading Co.

v. United States, 27 CIT 356, 373 (2003)). Here, RFAI reported the existence of the

factoring arrangements with respect to certain sales in its original Section B questionnaire

response. As Commerce explained, "in reviewing [during verification] the payment details

of each sales trace where factoring occurred, the factoring arrangement with the customer

was an intrinsic detail of the actual payment for ferrosilicon purchases." Decision

Memorandum at 30. Commerce therefore reasonably found that RFAI's minor corrections

submission, which described interest rates intrinsic to the transactions it already reported,

"corroborate[d], support[ed], or clarifie[d]" information already on the record. See Decision

Memorandum at 30.

        Plaintiffs next argue that Commerce's use of the factoring arrangements to derive

an interest rate for RFAI's imputed credit costs is unreasonable because the factoring

rates represent "the short-term interest rates at which the bank was willing to loan money

to CHEMK's customers, rather than the rate at which the bank would loan money to

CHEMK." Pls.' Br. at 32. The court again does not agree. Commerce's announced

practice, which Plaintiffs do not challenge, is to use factoring arrangements as a source

for short term interest rates. As Commerce explained:

> An accurate measure of a company's opportunity cost should include all of
> its sources of short-term funds, including factoring. Since factoring is a
> recognized method of financing receivables, the discount from face value
> can be used to establish credit expense. [Commerce] has previously
> recognized that factoring is a method of financing a receivable.

Decision Memorandum at 31 (quoting Pipe and Tube from Turkey Memorandum at 14);

see also Decision Memorandum for the Final Determination in the Less Than Fair Value

Investigation of Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India,

at   cmt.   8   (Dep't   of   Commerce   May   6,   2002),   <u>available   at</u>

http://enforcement.trade.gov/frn/summary/india/02-12295-1.txt (last visited this date).

Commerce's decision here to use CHEMK's factoring arrangements to derive an interest

rate for RFAI's imputed credit costs therefore reflects the routine and reasonable

application of its past practice.

Finally, Plaintiffs argue that Commerce's selection is inconsistent with <u>Policy</u>

<u>Bulletin 98.2</u> because the rate is based on the simple average of the interest rates

applicable to the subset of transactions Commerce analyzed during verification rather

than a weighted average. Pls.' Br. at 31; Pls.' Reply at 15-17; <u>see</u> <u>Policy Bulletin 98.2</u>

(explaining that Commerce will select a rate "base[d] . . . on the respondent's weighted-

average short-term borrowing experience in the currency of the transaction"). Commerce

announced its selection for the first time in the <u>Decision Memorandum</u> and other materials

released on the same day. <u>See</u> <u>Decision Memorandum</u> at 32 (citing <u>Final Analysis Memo</u>

(Dep't of Commerce July 25, 2014), CD 162). CC Metal's first opportunity to challenge

Commerce's selection as inconsistent with <u>Policy Bulletin 98.2</u> was in its brief before the

court. This means the agency has not had the opportunity to consider this argument in

the first instance. Defendant's response presents the <u>post hoc</u> rationalizations of agency

counsel to which the court may not defer. <u>See</u> <u>Burlington Truck Lines</u>, 371 U.S. at 168-

69. There may be some merit in Plaintiffs' contention: Commerce described its selection

as "the average of factoring-related interest rates that [it] verified," which does not appear

to be a <u>weighted</u> average as described in <u>Policy Bulletin 98.2</u>. <u>See</u> <u>Decision Memorandum</u>

at 32; <u>see also</u> Def.'s Resp. at 36 (referring to the rate as a "simple average short term

rate"). The court therefore remands for Commerce to consider Plaintiffs' contention that the selected rate is inconsistent with Policy Bulletin 98.2 because it is a simple average rather than a weighted average.

### E. Inbound Movement Expenses

The statute permits Commerce to reduce constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A). Commerce's regulations explain further that, if a party cannot report such expenses on a transaction-specific basis, Commerce "may consider allocated expenses[,] . . . provided [Commerce] is satisfied that the allocation method used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(1). A party advancing an allocation method must demonstrate to Commerce's satisfaction that "the allocation is calculated on as specific a basis as is feasible" and that "the allocation methodology used does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(2).

RFAI reported that it incurred certain movement expenses—sampling, brokerage and handling, customs charges, and inland transport—incident to shipping ferrosilicon to the United States ("U.S."). RFAI also reported that it could not report those expenses on a transaction-specific basis and proposed an allocation methodology that tied to the quantity of ferrosilicon RFAI sold in the U.S. Commerce accepted RFAI's methodology, explaining that "RFAI reported in an as specific manner as it could" and because "there

is nothing to indicate or support the conclusion that there are distortions or inaccuracies." Decision Memorandum at 36-37, 41-42.

Plaintiffs challenge Commerce's decision to accept RFAI's methodology for allocating movement expenses in calculating constructed export price. Specifically, Plaintiffs argue that four different types of movement expenses should have been allocated by the quantity of ferrosilicon RFAI <u>shipped</u> to the U.S. during the POR rather than the quantity of ferrosilicon RFAI <u>sold</u> in the U.S. during the POR. According to Plaintiffs, RFAI's methodology produces inaccuracies and distortions, and is not "as specific as possible." Pls.' Br. at 37-39.

In the court's view, Commerce's acceptance of RFAI's allocation methodology over Plaintiffs' proposed alternative was reasonable. Plaintiffs contend that RFAI's methodology "is distortive because it understates the amounts of the expenses actually incurred." Pls.' Br. at 37. Plaintiffs do not, however, support this contention with anything other than the unremarkable observation that their preferred denominator is smaller than that used in RFAI's allocation methodology. Are there inaccuracies in RFAI's reported sales volume? Are there discrepancies between the results of RFAI's allocation methodology and other data on the record? Apparently not, as Commerce noted. Decision Memorandum at 41 ("[T]here is nothing to indicate or support the conclusion that there are distortions or inaccuracies" in RFAI's allocation methodology.).

As to Plaintiffs' preferred allocation methodology, Commerce verified that RFAI assigned lot numbers to bulk shipments of ferroalloy (not just ferrosilicon) from the third country to the United States and generated new lot numbers once the ferroalloy products

(including ferrosilicon) reached the United States port, such that the lot numbers created in the third country are no longer relevant for the final sale to the U.S. customer. Consequently, as Commerce explained, the four movement expenses at issue "do not correspond, by discrete lot number, to the quantity of merchandise that shipped from the intermediary warehouse[e] during the [period of investigation]." Decision Memorandum at 36, 41. Put more simply, RFAI's books and records did not tie these four movement expenses to the quantity shipped during the period of investigation. Commerce also explained that Plaintiffs' preferred methodology would itself cause inaccuracies and distortions because RFAI shipped its ferrosilicon along with non-subject ferroalloy products. Decision Memorandum at 41. Because Plaintiffs' methodology did not tie to RFAI's books and records and had the potential to cause inaccuracies and distortions, Commerce reasonably concluded that RFAI's allocation was "as specific as RFAI was able to provide." See id. at 36-37, 41-42.

The court therefore sustains Commerce's decision to accept RFAI's movement expense allocation methodology.

### III. Conclusion

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Determination is sustained with respect to the date of sale, model matching, and inbound movement expense issues; it is further

**ORDERED** that this action is remanded to Commerce to clarify or reconsider, as appropriate, the warehousing expense and imputed credit expense issues; it is further

Court No. 14-00202                                                    Page 22

**ORDERED** that Commerce shall file its remand results on or before March 14, 2016; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


                                          _____/s/ Leo M. Gordon_____
                                            Judge Leo M. Gordon


Dated:   January 12, 2016
         New York, New York